In support of the title of the lessor of the plaintiff, he produced a grant from the State of North Carolina to William Mebane, dated the 14th day of *Page 354 
March, 1787, for seven thousand two hundred acres of land, and a deed from Mebane to him dated the 1st day of October, 1790.
The defendant claimed under a grant from the State of North Carolina dated 31st day of December, 1783, and an entry made the 20th day of December, 1783, in the name of John Read, calling for "three thousand eight hundred and forty acres lying on the Little Harpeth, beginning above Absalom Tatum's line, and up said river on both sides for complement." This entry is No. 160, and stands on the seventh page of the entry book.
The plaintiff then produced an entry, alleging it to be the one upon which his grant issued, dated the 7th day of February, 1784, calling to lie "on Harpeth, adjoining Absalom Tatum's line above." This entry was for five thousand two hundred acres, and stands on the first page of the entry taker's book.
It appeared in evidence that in the month of February, 1783, Absalom Tatum, Isaac Shelby, and Anthony Bledsoe, did, in pursuance of an appointment by the State of North Carolina, run the military line, and that for this service they were entitled to receive five thousand acres of land. That the commissioners kept a record of their proceedings in a book in which was entered the claims of the guards as well as their own, under a belief at that time that no other entry need be made; and that this book remained in this country where a general knowledge existed that it contained such entries, for several years, when it was burned by the Indians.
It also appeared that Tatum when he run what is called the western line, the commissioners having divided into three parties, made known his intention to locate his five thousand acres at or near the ten-mile tree, where the line crosses West Harpeth. The claim was notorious at and before the 20th day of December, 1783, as any object in the country. At that time also West Harpeth was notorious, and so was Little Harpeth. Tatum had no other claim in the country.
In the spring of 1783 the Legislature of North Carolina made provision that the commissioners, guards, etc. should make their entries in the pre-emption *Page 355 
office of Davidson County, in pursuance of which Tatum, on the 5th day of February, 1784, entered his five thousand acres, calling to begin "west of the ten-mile tree, and to run south and north and east for quantity, so as to include the creek," meaning West Harpeth. Evidence was introduced to prove that the entry thus made was a copy of the one previously made in the commissioner's books.
In the progress of the cause, three question arose: —
1. Whether the entry took effect from the date, or, from the time it was put upon the books. In the latter case the plaintiff had the oldest entry.
2. Whether the call for Little Harpeth could be rejected as surplusage?
3. Whether a call for Tatum's line before it had any legal existence, was a good call?
By a law passed in the spring of 1783, the holders of warrants were authorized, after the first day of the following October, to make their locations. At that time no book was required to be kept in which the entries were to be made; nor did any law pass making it necessary until some time in June, 1784. In the mean time a great many locations were made and deposited with the surveyor. When the law passed requiring a book to be kept, these locations were forwarded in the lump by the surveyor, to the person whom he had appointed to keep the books. They were then entered in the entry book without any regard to their respective dates; so that he who made the first location, and deposited it first with the surveyor, may stand second on the entry book. We consider it a matter of fair legal inference that the date of the location is the time it was placed with the surveyor; and that it takes its effect from that time, and not from its place on the book of the entry taker. If then the entry of Read is good in other respects, the defendants must prevail.
Read's entry calls for Little Harpeth and Tatum's line. It is impossible to comply with both these calls, as they are utterly repugnant to each other. Which then shall be rejected? We conceive that where *Page 356 
there are two calls in an entry repugnant to each other, the one general and the other locative, and both equally notorious, that the general call ought to be rejected as surplusage, and the locative call adhered to, under a well-known principle, that such a construction ought to be given to an entry, that, if possible, it may live rather than perish. We are, therefore, of opinion that the call for Little Harpeth may be rejected.
The principal difficulty, however, is about the call for Tatum's line, even although the other call be rejected. At the time Read made his entry, Tatum had no legal claim anywhere. A general knowledge that Tatum had a claim somewhere in the neighborhood, would not be giving sufficient locality to it, to authorize a man to call to adjoin it. If a particular spot becomes notorious as the claim of Tatum, so that it can be certainly identified, although in fact he has no claim there, then a call to adjoin it will be good, and special enough; but we do not conceive that a call to adjoin a claim, the lines of which can not be identified; or a line which has no legal existence, notwithstanding these uncertainties may be removed before the making of the adversary entry, will be sufficient. If the jury should be of opinion that Tatum's claim as to locality and identity, was notorious in the country before the 20th day of December, 1783, the time when Read made his entry, they will find for the defendant; otherwise, they will find for the plaintiff.